IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2016

**STATE OF TENNESSEE v. MONTEZ DEONTAY RIDLEY**

**Direct Appeal from the Criminal Court for Davidson County
No. 2014-A-258    Cheryl A. Blackburn, Judge**

**No. M2015-01607-CCA-R3-CD – Filed January 24, 2017**

A Davidson County Criminal Court Jury found the Appellant, Montez Deontay Ridley, guilty of aggravated robbery, a Class B felony. The trial court imposed a sentence of nine years. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction. Specifically, the Appellant contends that he was not at the scene of the crime, that no forensic evidence placed him at the scene, and that it was illogical that anyone would perpetrate the crime in such close proximity to the police. The Appellant also contends that the victims were unable to identify him from a photographic lineup. Finally, the Appellant contends that his confession was the result of lies told by the police. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Nick McGregor (on appeal) and Kyle Parks (at trial), Nashville, Tennessee, for the Appellant, Montez Deontay Ridley.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Glenn R. Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, the victim, Jacob "Jake" Morton, testified that he lived in Baltimore, Maryland, and that he worked as a basketball coach. In August 2013, Morton lived in Bowling Green, Kentucky. Morton had advertised athletic shoes for sale for $200 to $250 on Craigslist. The advertisement included Morton's cellular telephone number. A prospective buyer called him, and they had several conversations about the shoes. The buyer never identified himself by name, but Morton later identified the buyer as the Appellant.

Morton called the Appellant on the morning of August 16. They arranged to meet at Prince's Hot Chicken in Nashville at "lunchtime," which Morton thought was around noon or 1:00 p.m. Morton explained that he had sold several items on Craigslist and that he had been comfortable meeting people to whom he was selling the items. Morton took four pairs of shoes he had advertised because the Appellant had mentioned having a friend who wore the same size shoes as he. Morton's cousin, Sally Washington, accompanied him on his drive to Nashville.

Morton said that he called the Appellant when the Appellant did not come to the restaurant at the prearranged time. At first, the Appellant did not answer the telephone, but Morton kept calling him. Meanwhile, Morton and Washington went shopping, ate, and went sightseeing. Morton eventually spoke with the Appellant around 8:00 or 9:00 p.m. The Appellant suggested they meet at a Family Dollar store near Titans Stadium and gave Morton directions to the location. When Morton arrived, the store was closed. Morton called the Appellant, and the Appellant told Morton to come to an alley behind the store. The Appellant and another man were sitting on a ledge near some apartments. Morton parked but left the car running. The Appellant and the other man got up and walked toward Morton's car.

Morton got out of the car, but Washington remained in the front passenger seat. Morton walked to the back of the car and opened the trunk to show the Appellant the shoes. Morton and the Appellant talked for a few seconds about the shoes, then the Appellant pulled a gun out of his pocket and pointed it at Morton's side. The Appellant warned, "'Don't turn around.'" The Appellant kept the gun pointed at Morton while the other man searched Morton's pockets and took his wallet. Morton's wallet contained his driver's license, credit cards, "a lot of traveling stuff," and five or ten dollars. The Appellant and the other man took the four pairs of shoes from the trunk. Morton did not know how many pairs each man had but noticed that both men were carrying shoe boxes when they ran into a neighborhood around the apartments. Morton denied that he bought drugs from or sold drugs to the Appellant.

Morton said that after the robbery, he drove to a nearby Exxon station and called 911. He told the dispatcher about the robbery and described the robbers as follows:

Two men, African American, . . . both of them were close to 6'3" or 6'4", one guy had dreads, the other guy had short hair. . . . I described the clothes, what kind of shirts they had on. . . . [T]he one that stuck the gun into my side had gold teeth, he had gold fronts.

Morton said that police officers met him at the Family Dollar. He told the officers that his wallet and four boxes of shoes had been taken from him. Morton used his cellular telephone to look up his advertisements on Craigslist and showed the officers photographs of the shoes that were stolen. Morton said that the following four pairs of shoes were taken: "Air Jordan 13s 'He Got Game'"; "Jordan 6 Olympics"; "Jordan 4 Fire Reds"; and "Jordan 7 Raptors."

Morton said that later that night, he went to the police station and looked at photographic lineups. He acknowledged that he was unable to identify the Appellant or the other man and explained that he was "shaken" because the evening had been "traumatic." However, Morton positively identified the Appellant in the courtroom as the person who robbed him. He also stated that he recognized the Appellant's voice from their telephone conversation regarding the shoes. Morton gave the police the telephone number he used to contact the Appellant. None of the stolen items were ever returned to Morton.

On cross-examination, Morton acknowledged that he was not employed on August 16, 2013. Morton acknowledged that when Detective Mathis asked if he thought he could identify the robbers if he looked at a photographic lineup, he "obviously . . . said yes." Morton conceded that he was unable to make an identification from the photographs. Morton denied ever telling Detective Mathis that he could positively identify the robbers from the lineup. Morton asserted that he positively identified the Appellant as one of the robbers at the preliminary hearing.

Morton stated that when he first arrived at the Family Dollar, a police officer was "within that vicinity pulling somebody over." The Appellant instructed Morton to come to the alley behind the store, which was away from the police officer. Morton "did not think anyone would be brave enough to rob you with a police officer around the corner." Once Morton arrived in the alley, he could not see the officer. Morton estimated that approximately one to one and one-half minutes elapsed between the time he met with the Appellant in person to when the Appellant and his friend ran away after the robbery. Morton recalled that the officer was gone by the time the robbery ended. Morton denied meeting the Appellant to exchange shoes for drugs.

Sally Washington testified that she lived in Flint, Michigan. On August 16, 2013, she was visiting her cousin, Morton, in Bowling Green, Kentucky. That day, Morton and

Washington went to Nashville. Morton planned to sell some shoes, and he and Washington intended to go shopping and "hang out." They had chicken for lunch and were supposed to meet a potential shoe buyer at the restaurant, but the buyer did not arrive. After Morton had several conversations with the buyer, they agreed to meet at an alley behind a Family Dollar. Washington noticed a patrol car in the area. Nevertheless, she told Washington that it was late, it was dark, and that it appeared to be a bad neighborhood. Morton told her not to worry because they were not doing anything illegal.

Washington said that when Morton drove into the alley around 9:00 p.m., they saw two black men standing on a porch. The men stepped off the porch and approached the car. Morton got out of the car and popped the trunk. Washington stayed in the front passenger seat. The windows of the car were rolled down, and she watched the events in the rear-view mirror. When the buyers arrived at the back of the car, they told Morton, "'Give me these shoes, and give me your wallet.'" One of the men pointed an object that appeared to be a gun at Morton. Morton held his hands up and said, "'Just take it.'" Washington was scared. Morton ran, got into the car, and drove away. Washington looked in the rearview mirror and saw the two men running away, each with boxes of shoes.

Washington said that Morton drove to a nearby gas station and called 911. The police arrived, and Washington told the police that she saw one of the robbers with a gun. Washington was unable to identify the robbers from photographic lineups. However, she identified the Appellant in the courtroom as one of the robbers.

On cross-examination, Washington said that she was able to identify the Appellant in court because she could see him "face to face." Washington stated that Morton's vehicle was a four-door Audi and that she watched the events in the rear-view mirror. The alley was well-lit, and she saw the robbers. She saw the Appellant point what appeared to be a silver gun at Morton's side. Washington told the police before she saw the photographic lineup that she thought she would be able to identify the robbers from a photograph. However, she was unable to make an identification because she was "sh[aken] up." She did not give the police a description of the robbers, but Morton did. She recalled that one of the robbers had "long hair, dreads, [and] blue jeans."

Detective William Mathis with the Metro Nashville Police Department testified that on August 16, 2013, he was dispatched to a Family Dollar at 600 Shelby Avenue. When he arrived at 9:47 p.m., he saw one or two officers speaking with the victims. Detective Mathis explained that James Cayce Homes public housing was "[j]ust south" of the Family Dollar.

Detective Mathis spoke with Morton and Washington, who were cooperative. Morton provided Detective Mathis with the telephone number he used to contact the Appellant. Morton also showed him photographs of the athletic sneakers he was selling on Craigslist.

Detective Mathis said that the police did not attempt to find fingerprints, noting the interior of the trunk was carpet and textured vinyl that would not "hold a fingerprint." Additionally, Morton advised the police that the robbers did not touch the smooth exterior of the vehicle.

Around 11:00 p.m., Detective Mathis compiled a "black and white" photographic lineup that contained the Appellant's and Willie Bonds's photographs. Detective Mathis asked Morton and Washington to look at the photographic lineup, but they were unable to identify the robbers.

Brittany Lee Hunter testified that on October 29, 2013, the police came to her home and asked her about a cellular telephone number of which she was the subscriber of record. Hunter advised the police that on August 16, 2013, the Appellant, who was the father of Hunter's child, was using the telephone associated with the number. Hunter said that she and the Appellant lived together in the James Cayce Homes housing development near the Family Dollar in East Nashville.

On cross-examination, Hunter acknowledged that when the officers spoke with her on October 29, she initially gave them the wrong telephone number for the Appellant. She explained, however, that the Appellant frequently changed his telephone number. Hunter told the officers that she thought the Appellant lived with his mother in Antioch.

Metro Nashville Police Detective Michael Windsor testified that he was assigned to investigate the robbery. Detective Windsor examined Morton's cellular telephone records and learned the telephone number used to call Morton to set up the robbery. The subscriber of record for that telephone number was Brittany Hunter. Based upon a conversation with Hunter, Detective Windsor spoke with the Appellant about the robbery. The Appellant matched the description of one of the robbers given by Morton and Washington.

Detective Windsor said that he and Detective Rex Davenport interviewed the Appellant at the East Precinct on November 6, 2013. Immediately prior to the interview, Detective Windsor advised the Appellant of his Miranda rights, and the Appellant signed a waiver of his rights. At the beginning of the interview, the Appellant denied knowing anything about the robbery and denied any involvement in the crime. Eventually, the Appellant maintained that he had set up a transaction with Morton to exchange "fake drugs made up of baking soda" for the shoes.

Detective Windsor said that he found no evidence that Morton was buying or selling drugs. He acknowledged he suggested to the Appellant that "perhaps it was a drug deal." He explained that occasionally during interviews, he tried to blame the victim as an "interview technique" to get the suspect to talk.

Detective Windsor said that his interview with the Appellant was video and audio recorded, and the recording was played for the jury. During the interview, the Appellant denied ever seeing Morton. Detective Windsor advised the Appellant that the police found him through telephone records, that he matched the description of one of the robbers, and that one of the victims had recognized his voice and had positively identified him as one of the robbers. When the Appellant continued to deny involvement in the crime, Detective Windsor suggested that perhaps the victim accused the Appellant of robbery because the victim was unsatisfied with a drug deal. The Appellant eventually acknowledged that he needed new shoes and that he found someone willing to exchange shoes for cocaine. When the Appellant met with the seller, he gave the seller some baking soda that was "rocked up" to resemble cocaine. The Appellant took possession of two pairs of new shoes but refused to take two pairs of used shoes. The Appellant denied that a gun was involved. The Appellant acknowledged that after the exchange, he put on some "Air Jordan number 6s," which he identified from photographs of shoes from Morton's Craigslist advertisements. The Appellant said that when the shoes got "scuffed up," he gave them to a "junkie."

Detective Windsor testified that he told the Appellant that Morton said that the robber with dreads held the gun. Detective Windsor conceded that he lied to the Appellant, noting that Morton said that the person with shorter hair and gold teeth was the person who held the gun. Detective Windsor said that the Appellant had gold teeth.

On cross-examination, Detective Windsor acknowledged that when he told the Appellant he wanted to talk to him about a robbery, the Appellant denied knowing anything about a robbery. When Detective Windsor mentioned shoes, the Appellant "mentioned an incident involving shoes." Detective Windsor showed the Appellant a photograph of Morton, and the Appellant said that he did not recognize Morton. Detective Windsor told the Appellant that "we don't know what happened, we think this might have been a drug deal gone bad." Afterward, the Appellant conceded that he "traded some shoes for drugs." Despite repeated questioning about the location of the gun, the Appellant adamantly denied a gun was involved. Detective Windsor said that he lied when he told the Appellant that Morton positively identified him. Detective Windsor said that he never found a gun on the Appellant. Additionally, the shoes stolen from Morton were never found.

The Appellant did not testify or put on proof.

The jury found the Appellant guilty of aggravated robbery. The trial court sentenced the Appellant to nine years. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

As charged in this case, aggravated robbery is a robbery accomplished with a deadly weapon. Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103(a).

The Appellant contends that he was not at the scene of the crime, that no forensic evidence placed him at the scene, and that it was illogical that anyone would perpetrate the crime in such close proximity to the police. The Appellant also contends that the victims were unable to identify him from a photographic lineup. Finally, the Appellant contends that his confession was the result of lies told by the police. In the light most

favorable to the State, the proof adduced at trial revealed that Morton advertised shoes for sale on Craigslist. The Appellant contacted Morton about buying the shoes, and the men arranged for the sale to be completed at a restaurant in Nashville. Morton and Washington went to the restaurant, but the Appellant did not arrive. Morton repeatedly called the Appellant, and eventually, they arranged to meet at a Family Dollar. Upon Morton's arrival at the store, he did not see the Appellant. He called the Appellant, and the Appellant directed him to an alley behind the store. Morton drove to the alley and put his car in park. The Appellant and a friend approached Morton's car, and Morton got out of the car and opened the trunk. The Appellant and his friend walked to the back of the car. Washington could see the Appellant and his friend in the rearview mirror. The Appellant pointed a gun at Morton's side, and the Appellant and his friend took four pairs of shoes from Morton's trunk. The robbers ran away. Morton and Washington drove to an Exxon station, and Morton called 911. The police were unable to find any physical evidence, such as fingerprints, the stolen shoes, or the gun, to tie the Appellant to the crime. Nevertheless, Hunter testified that the Appellant was the only person to use the telephone number that Morton used to contact the buyer of the shoes. Further, the Appellant acknowledged to engaging in a deal with Morton, alleging that he gave Morton "fake drugs" in exchange for the shoes. The Appellant further acknowledged that he received a pair of "Jordan number 6s" and identified a photograph of the shoes from Morton's advertisements. Although Morton and Washington were unable to identify the Appellant from a photographic lineup, they both positively identified the Appellant in court as the robber with the gun.

The Appellant contends that he was not at the scene and that no forensic evidence placed him at the scene. However, the testimony of the two victims established that the Appellant was one of the robbers. See State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993) (providing that a victim's testimony, standing alone, is sufficient to support a conviction of robbery). Next, the Appellant complains that Morton's testimony was inconsistent. As an example, he notes Morton's testimony that he thought the area was safe because a police officer was nearby, but the Appellant robbed him in the area despite the police presence. Additionally, the Appellant contends that although Morton assured the police that he could identify the robbers from a photographic lineup, neither Morton nor Washington were able to identify the Appellant from the lineup, making Morton's in-court identification of the Appellant not credible. The Appellant's complaints concern the credibility of witness testimony. It is well-established that determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

Finally, the Appellant complains that his "confession was the result of a police lie." He does not challenge the admissibility of his confession; he merely argues that his confession is not credible in light of Detective Windsor's lies during interrogation. This court has previously stated that although an Appellant "contends that his confession to police was false and a result of police coercion, the truth of the statement and its afforded weight lies within the province of the jury." State v. Perdido Cook, No. W2001-00381-CCA-R3-CD, 2002 WL 1558487, at *4 (Tenn. Crim. App. at Jackson, Jan. 9, 2002).

We conclude that the evidence was sufficient to sustain the Appellant's conviction of aggravated robbery.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE